FITZSIMMONS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.    October 7, 1907.)

No. 1,340.

POST OFFICE—VIOLATION OF POSTAL LAWS—"LOTTERY."

    A scheme by which certificates are issued by a corporation, on each of which the holder agrees to pay $1 per week, subject to forfeiture for nonpayment, and about 75 per cent. of which payments are paid into a "mutual benefit credit fund" until all certificates prior in date have matured and been canceled, when his own certificate shall mature, and he shall be

paid from such fund the sum of $2 for each week such certificate has been in force, provided there is so much in the fund, not exceeding however $160, is a lottery within the meaning of Rev. St. § 3894 [U. S. Comp. St. 1901, p. 2659], and any person engaged in conducting such scheme by means of letters or circulars sent through the mails is guilty of a criminal offense under said section.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Post Office, § 54.

For other definitions, see Words and Phrases, vol. 5, pp. 4245–4252; vol. 8, pp. 7710–7711.

Nonmailable matter, see note to Timmons v. United States, 30 C. C. A. 79.]

In Error to the District Court of the United States for the Southern District of California.

The plaintiff in error was convicted of violation of the clause of section 3894 of the Revised Statutes [U. S. Comp. St. 1901, p. 2659], which provides that no letter, postal card, or circular concerning any lottery shall be carried in the mail or delivered at or through any postoffice or branch thereof. He was the president and a stockholder of a corporation organized under the laws of California, known as the "Cumulative Credit Company." The company issued certificates, the provisions of which were held by the court below to constitute a lottery. The provisions of the certificate material to the question here involved are as follows:

"This is to certify, that ——— is entitled to and agrees hereby to pay and contribute the amount of one dollar per week to the Cumulative Credit Company, a corporation, hereinafter designated as 'the Company' at its home office at 125 South Broadway, in the city of Los Angeles, California, for the purpose of creating an expense credit fund and a mutual benefit credit fund, for the uses and purposes hereinafter provided. Said payments to be made in each consecutive calendar week following the date hereof, until this certificate shall have been canceled in its regular order in pursuance of its conditions as herein stated.

"At the option of the owner hereof, the said weekly payments may be made in advance to cover a period of not to exceed five consecutive weeks.

"If for any reason the payment of the said one dollar per week to the company be not made by the owner hereof at the time and in the manner above provided for, this certificate shall be deemed to be delinquent, and all the rights of the owner hereof, hereunder, suspended; except, in the event of this certificate so becoming delinquent, if the owner hereof shall pay to the company, in addition to the one dollar per week provided to be paid herein, for the first week of each delinquency twenty-five cents, and for each succeeding week (not to exceed nine successive weeks) of such delinquency, the sum of one dollar, then this certificate shall again become and be in full force and effect. But if said additional payments be not so made and the weekly payments as aforesaid shall become and remain delinquent for ten successive weeks, then this certificate shall immediately become null and void and of no effect, and all rights and privileges hereunder of the owner hereof shall immediately cease and determine.

"The company is hereby authorized and directed to set aside seventy-five per cent. of the sixth to the eighteenth, inclusive, of the above-mentioned payments and one hundred per cent. of all payments thereafter, and place the same in the mutual benefit credit fund, from which shall be paid the amounts due on this and other like certificates as they severally shall mature as hereinafter provided, as follows:

"This certificate shall be deemed to be matured when all like certificates of prior date and number shall have been matured and canceled, and at its maturity the owner hereof, upon presentation and surrender to the company of this certificate, shall be paid by the company, from the said mutual benefit credit fund, the sum of two dollars for each calendar week of the period from and including the calendar week following the date hereof, to and including the calendar week in which the same matures; provided that there shall be sufficient money in said mutual benefit credit fund available for that purpose

to pay said amount, and provided further, that the amount so paid shall not exceed the sum of one hundred and sixty dollars; and upon payment of such sum due to the owner hereof this certificate shall be canceled by the company, and it is understood that the owner of this certificate shall be deemed at all times to be the person in whose name the same stands and appears upon the books of the company. The company is hereby authorized and directed to apply the balance of said payments, as hereinabove provided for, to the expense credit fund, to be used as the management may direct."

Walter R. Bacon, for plaintiff in error.

Oscar Lawler, U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The principal question here presented is whether the scheme referred to in the mail matter described in the indictment is a lottery. The plaintiff in error urges that it is not, that, while the scheme may involve the element of chance, it lacks the element of prize which is essential to a lottery, and counsel for the plaintiff in error quotes definitions of "lottery" which include the element of prize. But in law the term "lottery" is of wide signification. In Horner v. United States, 147 U. S. 449, 13 Sup. Ct. 409, 37 L. Ed. 237, Mr. Justice Blatchford discussed various definitions of lottery, and among others approved that found in Worcester's Dictionary, in which it is defined to be "a game of hazard in which small sums are ventured with the chance of obtaining a larger value, either in money or in other articles." That definition would include the scheme which is presented by the record in the present case. And not only is this so; but we think it clear that the element of prize is to be found in the scheme. In general, it may be said that anything of value offered as an inducement to participate in a scheme of chance is a prize. As applied to a scheme such as is disclosed in this case, a prize is any inequality in value resulting from chance in the distribution of money paid back to the contributors of the same. To constitute a prize, the inequality need not necessarily be great, and the element of prize may exist in a scheme so arranged as to return to each participant something of value, or even an equivalent for all that he pays in. It is plainly to be seen that, in the scheme under consideration, it may happen that several new members may send in their first subscriptions on the same day, and that he whose subscription is by chance first numbered may obtain a great advantage over him whose number is last. That advantage is undoubtedly in the nature of a prize. The subscriber to the scheme knows full well that no increment is to be earned by his money, but that all returns are to come from his own contributions and the contributions of others. The chance of getting back from these sources double the sum that he pays in and getting it soon is the prize which lures him to make the payments. It is evident that there can be no other inducement to subscribe than the chance of securing an early or lucky number and the hope of obtaining an advantage by chance over other subscribers. But we deem it unnecessary to enter into any extended discussion of the meaning of the word "lottery," or the decisions of the courts with reference thereto, for the questions presented in the present case are in

our opinion fully covered by the decision of the Supreme Court in Public Clearing House v. Coyne, 194 U. S. 497–512, 24 Sup. Ct. 789, 48 L. Ed. 1092. In that case the scheme involved was similar to that which is presented in the case at bar. The plan contemplated that each person who became a member should pay $3 as an enrollment fee, and $1 per month for five years, and agree to co-operate by inducing others to become members, for which he was to receive his pro rata share of the total amount realized when entitled to a realization as provided at the end of five years. The plan contemplated that in the end the member who secured new members and the member who did not should receive the same amount. The court said:

"The only money paid in was a small enrollment fee of $3 and a monthly payment of $1 for five years. The return to the subscribing member which is called a realization is not only uncertain in its amount, but depends largely upon the number of new members each subscriber is able to secure, as well as the number of members which his co-operators are able to secure. The return to members who have been able to secure a large number of other members and to pay their own monthly dues may be very large in comparison with the amount paid in, but the amount of such return depends so largely, and, indeed, almost wholly, upon conditions which the member is unable to control, that we think it fulfills all the conditions of a distribution of money by chance. In becoming a co-operator each new member evidently contemplates that a large number, probably a large majority of those subscribing, will drop out before the end of five years. * * * The uncertainty of the amount realized upon these settlements is evident from the fact that, while a member may possibly realize as high as $15 for every dollar invested by him, he may realize no profit at all, or, in case the business is suspended, may realize nothing."

The court held the scheme to be a lottery within the meaning of the statute. But it is urged that the Coyne Case is not decisive of the case at bar, for the reason that the schemes involved in the two cases differ in an essential particular. It is said that in the Coyne Case the member was to pay certain fixed sums for a certain fixed period and then his obligation ceased, and that thereby the creation of an adequate redemption fund was made dependent directly upon the contingency of lapses of members and the acquisition of new business, whereas, in the present case, the obligation is continuous and indefinite, and requires the member to continue his monthly payment until an amount sufficient to pay him $160 shall be realized. It is argued that, by virtue of this provision, the amount which each member is to receive is not only not uncertain, but that it does not depend upon the number of new subscribers. It is true that in the scheme thus detailed the amount which each member is to receive is not uncertain if he keeps on making his contributions. The uncertainty lies in the time when he shall receive it, an uncertainty so great as to vitiate the scheme as fully as would an uncertainty in the amount. But not only is there uncertainty as to time, but there is uncertainty in the amount to be received as compared with the amount to be paid in. If there were but one member in the scheme, before he could realize his $160, he would be required to pay into the company at least $240, and to continue his regular payments until he had invested that amount. If there were more members, he might be required to pay more and for a longer time, or he might realize his $160 in a much shorter time, de-

pending on the number of members who dropped out and the number of new members who joined and the order in which the subscriptions were numbered. In all its essential features it is the scheme which the court had under consideration and condemned in the Coyne Case.

It is assigned as error that the court in instructing the jury read and quoted from the decision of the Supreme Court in Public Clearing House v. Coyne; and said:

"These uncontradicted facts bring the case at bar clearly within the doctrine enunciated by the Supreme Court of the United States in the foregoing quotations, and I therefore instruct you that the business of the Cumulative Credit Company as conducted at all the times charged in the indictment and as shown by the uncontradicted evidence of the case was a lottery, and you will so find."

It is the general rule that, unless prohibited by statute, the court in charging the jury may read legal decisions or extracts therefrom containing propositions of law applicable to the case at bar. People v. Minnaugh, 131 N. Y. 563, 29 N. E. 750; People v. Niles, 44 Mich. 606, 7 N. W. 192; People v. Bowkus, 109 Mich. 360, 67 N. W. 319; State v. Dearing, 65 Mo. 530; Kirby, Ex'r, v. Wilson et al., 98 Ill. 240; State v. Chiles, 58 S. C. 47, 36 S. E. 496. But the question is not properly before us, for the only exception taken to the charge to the jury was stated at the close of the charge in these words:

"To the giving of each and all of the said instructions for the government the defendant by his counsel then and there excepted."

In Block v. Darling, 140 U. S. 234, 11 Sup. Ct. 832, 35 L. Ed. 476, it was held that the general exception "to all and each part of the foregoing charge and instructions" suggested nothing for the consideration of an appellate court.

It is contended, further, that there was no evidence to sustain the verdict, in that there was no proof that the plaintiff in error mailed the documents which are referred to in the indictment. To this it is sufficient to say that there was no request for a peremptory instruction to the jury to acquit the plaintiff in error for want of evidence of his guilt. Harless v. United States, 34 C. C. A. 400, 92 Fed. 353, McDonnell v. United States, 66 C. C. A. 671, 133 Fed. 293, and cases there cited. But we have considered the evidence, and we find no merit in the contention. It was proven, and was not disputed, that at all the dates referred to in the indictment the plaintiff in error was the ower and manager of the Cumulative Credit Company, that the documents referred to in the indictment were transferred through the mails, that the most of it bore the signature of the plaintiff in error, and that there was no one else at his place of business who did or could have mailed the same. There was proof that the plaintiff in error had directed correspondents to send mail matter to him addressed, not to him, but to fictitious names for the purpose of avoiding the exclusion thereof by the post office department, and the plaintiff in error admitted that the documents described in the indictment and others admitted in evidence were signed by him and were mailed by some one in his office, he having left them on his desk for that purpose.

We find no error. The judgment is affirmed.